No. 2023-109

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

IN RE WAVERLY LICENSING LLC,

*Petitioner*.

On Petition for a Writ of Mandamus from the United States District Court for the District of Delaware in Case Nos. 1:22-cv-00420-CFC, 1:22-cv-00422-CFC, Chief Judge Colm F. Connolly

## BRIEF FOR *AMICUS CURIAE* INTEL CORPORATION
## IN SUPPORT OF RESPONDENTS

THOMAS G. SAUNDERS
GREGORY H. LANTIER
AMANDA L. MAJOR
JOSHUA L. STERN
MATTHEW E. VIGEANT
GARY M. FOX
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

WILLIAM F. LEE
SOFIA C. BROOKS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

*Attorneys for Amicus Curiae Intel Corporation*

December 9, 2022

# CERTIFICATE OF INTEREST

Counsel for *Amicus Curiae* Intel Corporation certifies the following:

**1.    Represented Entities**.  Fed. Cir. R. 47.4(a)(1).  Provide the full names of all entities represented by undersigned counsel in this case.

Intel Corporation

**2.    Real Party in Interest**.  Fed. Cir. R. 47.4(a)(2).  Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None.

**3.    Parent Corporations and Stockholders**.  Fed. Cir. R. 47.4(a)(3).  Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None.

**4.    Legal Representatives**.  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

None.

**5.    Related Cases**.  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  *See also* Fed. Cir. R. 47.5(b).

*In re Nimitz Technologies LLC*, No. 2023-103 (Fed. Cir.)

*In re Creekview IP LLC*, No. 2023-108 (Fed. Cir.)

Petitioner identifies specific cases that it considers related.  However, given the nature of Petitioner's challenge to the Standing Order Regarding Third-Party Litigation Funding Arrangements, the petition could theoretically

affect all cases pending before Chief Judge Connolly of the U.S. District Court for the District of Delaware.

**6.    Organizational Victims and Bankruptcy Cases**.    Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

None.

Dated:  December 9, 2022

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ..................................................................... v

INTEREST OF *AMICUS CURIAE*............................................................. 1

INTRODUCTION .................................................................................. 4

ARGUMENT ......................................................................................... 4

I.    THE DISTRICT COURT HAS AUTHORITY TO ISSUE AND ENFORCE
      ITS STANDING ORDERS ................................................................. 4

      A.    Rule 83(b) Expressly Grants Authority To Issue
            Procedural Orders................................................................. 5

      B.    The District Court Also Has Inherent Authority To Issue
            And Enforce Standing Orders .............................................. 5

      C.    Many Courts Require Disclosure Of Third-Party
            Litigation Funding................................................................ 6

      D.    The District Court's Standing Orders Do Not Conflict
            With Any Statute Or Rule .................................................... 8

II.   THE DISTRICT COURT'S ORDERS SERVE IMPORTANT PURPOSES .................... 10

      A.    The Mandated Disclosures Are Needed To Avoid Any
            Potential Conflicts Of Interest............................................. 10

      B.    The Disclosures Also Promote Public Interest In
            Transparency ...................................................................... 13

      C.    Transparency Is Especially Important In An Era Of
            Opaque Litigation Funding And Hedge-Fund Driven
            Litigation ........................................................................... 14

CONCLUSION ..................................................................................... 17

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Benedict v. Super Bakery, Inc.*,
   665 F.3d 1263 (Fed. Cir. 2011) ...........................................................17

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
   38 F.4th 1025 (Fed. Cir. 2022) ...........................................................12

*Chambers v. NASCO, Inc.*,
   501 U.S. 32 (1991) ..........................................................................5, 17

*Chase Manhattan Bank v. Affiliated FM Insurance Co.*,
   343 F.3d 120 (2d Cir. 2003) ...............................................................11

*Cook v. Welty*,
   253 F. Supp. 875 (D.D.C 1966) ..........................................................13

*DePuy Synthes Products, Inc. v. Veterinary Orthopedic Implants, Inc.*,
   990 F.3d 1364 (Fed. Cir. 2021) ..........................................................13

*Dietz v. Bouldin*,
   579 U.S. 40 (2016) ...............................................................................5

*Doe v. Megless*,
   654 F.3d 404 (3d Cir. 2011) ...............................................................13

*Eash v. Riggins Trucking Inc.*,
   757 F.2d 557 (3d Cir. 1985) .................................................................5

*Hanna v. Plumer*,
   380 U.S. 460 (1965)...............................................................................5

*In re Violation of Rule 23(d)*,
   635 F.3d 1352 (Fed. Cir. 2011) ..........................................................13

*Liljeberg v. Health Services Acquisition Corp.*,
   486 U.S. 847 (1988)..............................................................................12

*United States v. Hudson & Goodwin*,
   11 U.S. (7 Cranch) 32 (1812) .............................................................16

*United States v. Martin*,
 746 F.2d 964 (3d Cir. 1984) ........................................................ 12-13

*Wilson v. Iron Tiger Logistics, Inc.*,
 628 F. App'x 832 (3d Cir. 2015) ...........................................................5

## DOCKETED CASES

*Uniloc 2017 LLC v. Netflix, Inc.*,
 No. 8:18-cv-02055-GW-DFM (C.D. Cal.) ...........................................3

*VLSI Technology LLC v. Intel Corp.*,
 No. 1:18-cv-966-CFC-CJB (D. Del.) .................................................2, 3

## STATUTES

28 U.S.C.
 § 455(a) ...............................................................................................10
 § 455(b) ...............................................................................................10
 § 455(b)(4) ...........................................................................................10
 § 2072 ....................................................................................................5
 § 2075 ....................................................................................................5

35 U.S.C.
 § 100 ......................................................................................................8
 § 281 ......................................................................................................8

W. Va. Code § 46A-6N-6 .........................................................................7

Wis. Stat. § 804.01(2)(bg) .........................................................................7

## RULES

Fed. R. App. P.
 Rule 26.1 ........................................................................................4, 6, 9

Fed. R. Civ. P.
 Rule 7.1 ........................................................................................ *passim*
 Rule 17(a)(1) ..........................................................................................8
 Rule 26(a)(1)(A)(iv) .............................................................................13
 Rule 83(b) ......................................................................................4, 5, 9

3d Cir. R. 26.1.1(b) ...................................................................................6

4th Cir. R. 26.1(a)(2)(B)-(C)........................................................6

5th Cir. R. 28.2.1 ........................................................................6

6th Cir. R. 26.1(b) ......................................................................6

10th Cir. R. 46.1(D)(1)-(2) .........................................................6

11th Cir. R. 26.1-1(a)(1) & 26.1-2(a) ..........................................6

C.D. Cal. L.R. 7.1-1 ...................................................................6

D. Md. L.R. 103.3(b) ..................................................................7

D.N.J. L.R. 7.1.1(a).....................................................................7

N.D. Cal. L.R. 3-15(b)(2) ............................................................7

N.D. Ga. L.R. 3.3(A)(2) ..............................................................6

N.D. Tex. L.R. 3.1(c), 3.2(e)........................................................6

S.D. Ga. L.R. 7.1.1 .....................................................................7

## OTHER AUTHORITIES

*2021 Year-End Report on the Federal Judiciary* .......................................11

Fortress Overview, https://www.fortress.com/about ................................1

Grimaldi, James V. et al., *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, Wall St. J. (Sept. 28, 2021), https://www.wsj.com/articles/131-federal-judges-broke-the-law-by-hearing-cases-where-they-had-a-financial-interest-11632834421 ......................................................................11

Intel, 2021 10-K, https://tinyurl.com/2v3w9v8w ..............................2

Kalajdzic, Jasminka et al., *Justice for Profit: A Comparative Analysis of Australian, Canadian and U.S. Third Party Litigation Funding*, 61 Am. J. Comp. L. 93 (2013).....................................................15

Kass, Dani, *Mapping Out VLSI-Intel's Sprawling Patent War*, Law360 (Nov. 23, 2022), https://tinyurl.com/3vmtdr2n ....................2

Langford, Carol, *Betting on the Client: Alternative Litigation Funding Is an Ethically Risky Proposition for Attorneys and Clients*, 49 U.S.F. L. Rev. 237 (2015) ....................................................................14

Merken, Sara, *Large Law Firms Tap Bigger Share of 'Portfolio' Litigation Funding*, Reuters (Mar. 23, 2022), https://tinyurl.com/4rny5v66 ...............................................................16

Miller, Shawn P. et. al., *Who's Suing Us? Decoding Patent Plaintiffs Since 2000 with the Stanford NPE Litigation Dataset*, 21 Stan. Tech. L. Rev. 235 (2018) ..................................................................15

*SoftBank Nears US$2b Sale of Fortress to Mubadala*, Business Times (Sept. 7, 2022) ...........................................................................1

Standing Order for All Judges of the Northern District of California: Contents of Joint Case Management Statement .....................................7

Taylor, Paul, *Disclosing High Roller Bankrolling in the Patent Litigation Casino: The Need to Regulate Third Party Litigation Financing*, J. Pat. & Trademark Off. Soc'y (forthcoming) ...............................15

Tighe, Patrick A., *Survey of Federal and State Disclosure Rules Regarding Litigation Funding*, Advisory Committee on Civil Rules 210 (Feb. 7, 2018), https://www.uscourts.gov/sites/default/files/2018-04-civil-rules-agenda-book.pdf .......................................6, 10

U.S. Chamber of Commerce Institute for Legal Reform, *A New Threat: The National Security Risk of Third Party Litigation Funding* (Nov. 2022) ............................................................................16

Unified Patents, *Litigation Annual Report, 2021* (last accessed Nov. 28, 2022), https://portal.unifiedpatents.com/litigation/annual-report ................15

Xiao, Jean, *Heuristics, Biases, and Consumer Litigation Funding at the Bargaining Table*, 68 Vand. L. Rev. 261 (2015) ..........................................15

Zur, Eran, *Why Investment-Friendly Patents Spell Trouble for Trolls* (Sept. 24, 2015), https://tinyurl.com/243xmd37 ....................................2

## INTEREST OF *AMICUS CURIAE*[1]

Intel Corporation is a global leader in the design and manufacturing of semiconductor products, including hardware and software products for networking, telecommunications, cloud computing, artificial intelligence, autonomous driving, and other applications.  Intel invests billions of dollars each year in research and development and, as both a significant patent holder and a frequent defendant in patent litigation, has a strong interest in ensuring that patent litigation is transparent.

Intel, like many other large technology companies, has firsthand experience with the problems caused by patent litigation brought by non-practicing entities (NPEs) with deliberately opaque litigation funding and ownership structures.  For example, it has been the target of litigation driven by Fortress Investment Group LLC, which manages approximately $50 billion in assets, primarily held in private equity and hedge funds.  *See* Fortress Overview, https://www.fortress.com/about.[2]
Among its other activities, Fortress's patent monetization business creates or

---

[1]    No counsel for any party authored this brief in whole or in part, and no person or entity other than amicus and its counsel made a monetary contribution intended to fund the preparation or submission of this brief.  Respondents do not oppose the filing of this brief.  Petitioner will not oppose, but stated that it does not consent.

[2]    Fortress's current owner, Softbank Group, is reportedly in talks to sell Fortress to Mubadala Investment Co., a sovereign wealth fund of Abu Dhabi.  *See SoftBank Nears US$2b Sale of Fortress to Mubadala*, Business Times (Sept. 7, 2022), https://tinyurl.com/2ypfysmy.

acquires NPEs to assert or license patents, most often through waves of patent litigation against technology companies. *VLSI Tech. LLC v. Intel Corp.*, No. 1:18-cv-966-CFC-CJB (D. Del.), D.I. 732 ¶ 159. Eran Zur, who manages the IP Finance Group at Fortress, has explained that patent litigation can lead to "oversized awards" due to the "sheer complexity" of devices and damages being awarded "on the price of the entire end product" instead of based on the "specific patent claim."[3]

VLSI is an NPE created by Fortress-managed funds in 2016 to monetize patents acquired from NXP USA Inc. VLSI acquired over 170 patents from NXP for $35 million and, to date, VLSI's only activity has been to assert 23 different patents against Intel across seven different suits. VLSI's strategy is to assert its patents in waves of litigation with outsized damages requests, such that even a single successful suit would produce a windfall for its investors and Fortress. For example, VLSI initially sought $4.13 billion in damages in the District of Delaware, and has sought as much as $7.1 billion in the Northern District of California. Intel, 2021 10-K at 108, https://tinyurl.com/2v3w9v8w. In the Western District of Texas, VLSI lost one suit against Intel, but won a $2.175 billion judgment that is currently on appeal and a recent $948 million verdict. Kass, *Mapping Out VLSI-Intel's Sprawling Patent War*, Law360 (Nov. 23, 2022), https://tinyurl.com/3vmtdr2n.

---

[3]    Zur, *Why Investment-Friendly Patents Spell Trouble for Trolls* (Sept. 24, 2015), https://tinyurl.com/243xmd37.

A hallmark of Fortress's NPE strategy has been the use of complicated ownership structures that hide the involvement of Fortress and its investors behind layers of limited liability companies and partnerships. *See Uniloc 2017 LLC v. Netflix, Inc.*, No. 8:18-cv-02055-GW-DFM (C.D. Cal.), D.I. 188 at 9-10 (Netflix discussing how Uniloc, another Fortress NPE, sought to conceal the nature of its relationship with Fortress). In VLSI's various infringement suits against Intel, it too has steadfastly refused to provide the court or Intel with the identities of the partners and members who ultimately own VLSI and stand to benefit from its suits.

Intel is a party to litigation before Chief Judge Connolly that is subject to the challenged standing order regarding third-party litigation funding (Third-Party Funding Order) and the companion standing order requiring limited liability companies and partnerships to disclose their owners (Ownership Order). *See VLSI Tech. LLC v. Intel Corp.*, No. 1:18-cv-966-CFC-CJB (D. Del.). The district court found that VLSI's disclosures under the Ownership Order were "clearly inadequate" because VLSI has refused to disclose the identities of the "'retirement funds, sovereign wealth funds, foundations, high net worth individuals, endowments and other institutional investors'" who ultimately own VLSI. *See, e.g.*, *id.*, D.I. 975 at 2.

## INTRODUCTION

The arguments in this brief largely track Intel's amicus brief in *In re Nimitz Technologies LLC*, No. 2023-103 (Fed. Cir.). As Intel explained there, the district court undoubtedly had authority to issue its standing orders. Federal Rule of Civil Procedure 83(b) empowers courts to issue procedural orders where, as here, no contrary statute or rule dictates otherwise. District courts also have inherent authority to regulate litigation before them and to prevent abuse of the judicial process. Waverly Licensing LLC's argument that the Patent Act prohibits requiring any disclosures beyond who owns the legal title to a patent is plainly incorrect. Indeed, if accepted, it would invalidate numerous orders and rules, including Federal Rule of Civil Procedure 7.1 and Federal Rule of Appellate Procedure 26.1.

The standing orders serve important purposes, including helping the court screen for potential conflicts and promoting the public interest in transparency. Both goals are critical in an era of opaque litigation funding and hedge-fund driven litigation, in which investors gamble on inflated damages awards and serial litigation, while concealing their identities and involvement behind shell NPEs.

## ARGUMENT

## I.    THE DISTRICT COURT HAS AUTHORITY TO ISSUE AND ENFORCE ITS STANDING ORDERS

The Petitioner in *Nimitz* belatedly withdrew its challenge to the district court's underlying standing orders. *Nimitz*, No. 23-103 (Fed. Cir.), ECF No. 44, at

5. In addition, this Court held that there was no clear and indisputable right to terminate the district court's inquiry under the standing orders. *Id.* Waverly's challenge to the district court's standing orders should also be rejected. The district court had ample authority to issue and enforce its standing orders.

### A. Rule 83(b) Expressly Grants Authority To Issue Procedural Orders

Federal Rule of Civil Procedure 83(b) authorizes district courts to issue standing orders, stating that "[a] judge may regulate practice in any manner consistent with federal law, rules adopted under 28 U.S.C. §§ 2072 and 2075, and the district's local rules." The Advisory Committee Notes explain that "[t]his rule provides flexibility to the court in regulating practice when there is no controlling law" since "courts rely on multiple directives to control practice" including "standing orders." Fed. R. Civ. P. 83(b) advisory committee's notes to 1995 amendments; *see also Wilson v. Iron Tiger Logistics, Inc.*, 628 F. App'x 832, 834 n.2 (3d Cir. 2015) ("Rule 83(b) allows courts discretion to manage cases when the rules are silent on an issue …."); *Nimitz*, No. 23-103 (Fed. Cir.), ECF No. 44, at 5.

### B. The District Court Also Has Inherent Authority To Issue And Enforce Standing Orders

The district court also has inherent authority to craft procedures governing litigation before it. *See Eash v. Riggins Trucking Inc.*, 757 F.2d 557, 563 (3d Cir. 1985); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (collecting cases). "The Federal Rules of Civil Procedure set out many of the specific powers of a

5

federal district court," but "they are not all encompassing." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). The Supreme Court has thus "long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Id*. (citation omitted); *see also Hanna v. Plumer*, 380 U.S. 460, 472-473 (1965) (identifying "matters which relate to the administration of legal proceedings," as "an area in which federal courts have traditionally exerted strong inherent power, completely aside from the powers Congress expressly conferred in the Rules").

### C.  Many Courts Require Disclosure Of Third-Party Litigation Funding

The district court's standing orders are not outliers. Many courts require similar disclosures, going beyond the bare minimum required by Federal Rule of Civil Procedure 7.1 and Federal Rule of Appellate Procedure 26.1.

For example, six courts of appeals require that parties disclose a person or entity—including a third-party litigation funder—with a financial interest in a suit. *See*, *e.g.*, 3d Cir. R. 26.1.1(b) ("Every party to an appeal must identify … every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest."); *see also* 4th Cir. R. 26.1(a)(2)(B)-(C); 5th Cir. R. 28.2.1; 6th Cir. R. 26.1(b); 10th Cir. R. 46.1(D)(1)-(2); 11th Cir. R. 26.1-1(a)(1) & 26.1-2(a).

6

Similarly, many district courts have local rules that require disclosure of all entities with a financial interest, including litigation funders.[4]  Others have more targeted rules that specifically address third-party litigation funding.  For example, the District of New Jersey requires parties to disclose "information regarding any person or entity that is not a party and is providing funding for some or all of the attorneys' fees and expenses for the litigation on a non-recourse basis" in exchange for a stake in the litigation.  D.N.J. L.R. 7.1.1(a).

Other district courts use standing orders to implement litigation-funding disclosure requirements.  For example, the Northern District of California has a local rule that requires disclosure of "a financial interest of any kind in the subject matter in controversy or in a party to the proceeding."  N.D. Cal. L.R. 3-15(b)(2).  It also has a standing order requiring the same disclosure in joint case management statements.  *See* Standing Order for All Judges of the Northern District of California: Contents of Joint Case Management Statement ¶ 18.

---

[4]    *See* Tighe, *Survey of Federal and State Disclosure Rules Regarding Litigation Funding*, Advisory Committee on Civil Rules 210-211 (Feb. 7, 2018), https://www.uscourts.gov/sites/default/files/2018-04-civil-rules-agenda-book.pdf; *see also, e.g.*, N.D. Tex. L.R. 3.1(c), 3.2(e) (requiring "a complete list of all persons, associations of persons, firms, partnerships, corporations, guarantors, insurers, affiliates, parent or subsidiary corporations, or other legal entities that are financially interested in the outcome of the case"); C.D. Cal. L.R. 7.1-1 (similar); N.D. Ga. L.R. 3.3(A)(2) (similar); S.D. Ga. L.R. 7.1.1 (similar); D. Md. L.R. 103.3(b) (similar for "any financial interest whatsoever").

Certain states require automatic disclosure of litigation funding in discovery. *See* Wis. Stat. § 804.01(2)(bg) (disclosure of "any agreement under which any person … has a right to receive compensation that is contingent on and sourced from any proceeds of the civil action"); W. Va. Code § 46A-6N-6 (similar).

The district court's standing orders fit comfortably into this broader pattern of orders designed to equip judges with the information they need to screen for potential conflicts of interest.

### D.    The District Court's Standing Orders Do Not Conflict With Any Statute Or Rule

No statute or rule precludes the district court's standing orders.  Federal Rule of Civil Procedure 7.1 sets a floor, not a ceiling, when it requires corporate parties to disclose any parent corporation and publicly held corporation owning 10% or more of its stock.  The Advisory Committee Notes state that Rule 7.1 "does not cover all of the circumstances that may call for disqualification" and "does not prohibit local rules that require disclosures in addition to those required."  Fed. R. Civ. P. 7.1 advisory committee's notes to 2002 rules.  Because Rule 7.1 is not meant to be all encompassing, it also leaves room for standing orders that require additional disclosures.

Waverly incorrectly argues that the Patent Act and the Federal Rules of Civil Procedure—neither of which speak to this issue—implicitly prohibit the court from requiring disclosure of the facts sought by the standing orders.  Pet. 14-18.  But this

turns the analysis on its head.  Under Rule 83(b) and the court's inherent authority, the absence of any provision expressly addressing litigation funding leaves a district court free to require additional disclosures.

Nothing in the Patent Act prohibits a court from requiring the disclosure of third-party funding or ownership arrangements.  The two provisions Waverly cites— 35 U.S.C. §§ 100 and 281—merely state who can bring an infringement action.  Neither supports the inference that Congress prohibited courts from requiring additional disclosures to determine who else has an interest in the litigation.  The same is true for Federal Rule of Civil Procedure 17(a)(1), which requires a suit to be brought in the name of the real party in interest and, if anything, supports the district court's inquiries.

Taken to their logical conclusion, Waverly's arguments would invalidate a host of long-standing rules.  For example, its arguments that "courts cannot consider facts relating to who might be the beneficiaries of patent enforcement," Pet. 15-16, and that patent owners are entitled to "prosecute patent cases without disclosing who might be other parties in interest," Pet. 18, would invalidate the numerous local rules discussed above.  It would even call into question the baseline disclosures required by Federal Rule of Civil Procedure 7.1 and Federal Rule of Appellate Procedure 26.1.

The Court should reject Waverly's extreme position, which would leave judges powerless to screen for a variety of financial conflicts.  The district court had ample authority to issue and enforce its standing orders.

## II.    THE DISTRICT COURT'S ORDERS SERVE IMPORTANT PURPOSES

The district court's standing orders help ensure that the court does not have conflicts, financial or otherwise.  Some plaintiffs go to extreme lengths to hide their funders or true owners from the court.  This increases the risk that courts will not identify disqualifying conflicts in a timely manner, diminishing public confidence in the courts.  Opaque litigation funding also has other negative consequences, such as reducing transparency in the judicial system, increasing the number of frivolous lawsuits, and making settlement more difficult.

### A.    The Mandated Disclosures Are Needed To Avoid Any Potential Conflicts Of Interest

Disclosure of litigation funding "help[s] judges assess recusal and disqualification." Tighe, *Survey of Federal and State Disclosure Rules*, at 210.  Full disclosure is particularly important in patent cases, because litigation funders and investors often attempt to hide behind complex structures and NPEs to conceal who is really behind a suit.

Federal judges are required to recuse in a variety of circumstances that create a conflict or the appearance of one.  Section 455(b) identifies situations in which recusal is required and cannot be waived.  For example, Section 455(b)(4) provides

that a judge "shall … disqualify himself" where "[h]e knows that he, individually or as a fiduciary, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4).

In addition to the specific grounds for recusal in Section 455(b), Section 455(a) states that a judge is required to recuse "in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  This broad catchall language is meant to capture situations where the public may question the judge's impartiality even if the circumstances fall outside of the categorical rules in Section 455(b).  *See Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 128-129 (2d Cir. 2003).

Judges are expected to remain informed of all interests that could create potential conflicts.  The rules thus "require some reasonable investigation and action on a judge's own initiative."  *See Chase Manhattan*, 343 F.3d at 130-131 (explaining that "Section 455 is not a provision that requires judicial action only after a party to the litigation requests it").  As Chief Justice Roberts has emphasized, judges are "duty-bound to strive for 100% compliance because public trust is essential, not incidental, to [their] function."  *2021 Year-End Report on the Federal Judiciary* 3-

11

4. Courts must therefore be "scrupulously attentive to both the letter and spirit of [the] rules." *Id*.

When judges fail to investigate potential conflicts and must be disqualified later, it undermines public trust and can require vacatur of any rulings issued while a conflict existed.  The Wall Street Journal, for example, released an investigative report detailing the financial conflicts of over one hundred federal judges in September 2021.[5]  This Court recently vacated a multi-billion-dollar judgment because the presiding judge belatedly discovered that his wife held stock in the defendant.  *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, 38 F.4th 1025, 1030 (Fed. Cir. 2022).  Such conflicts not only create a risk of "injustice to the parties in the particular case," but also "risk … undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864, (1988).  These deleterious effects can occur even where the court determines that the judge "did not have actual knowledge of … [the] interest" during the relevant period. *Id*.

Identifying conflicts early is therefore crucial to prevent recusal issues from arising down the line.  Indeed, the only reliable way to ensure that a judge is not

---

[5]    Grimaldi et al., *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, Wall St. J. (Sept. 28, 2021), https://www.wsj.com/articles/131-federal-judges-broke-the-law-by-hearing-cases-where-they-had-a-financial-interest-11632834421.

conflicted is to require disclosure of all entities with a financial or ownership interest in the case.

### B.    The Disclosures Also Promote Public Interest In Transparency

Disclosure of entities with financial or ownership interests also promotes transparency. This enables the public to understand who stands to benefit from litigation, informing the public conversation regarding the best use of courts in an era of crowded dockets and the impact of speculative patent litigation on American industry.

The Third Circuit has recognized a "public interest in monitoring judicial proceedings" that "supports a presumption in favor of access." *United States v. Martin*, 746 F.2d 964, 968 (3d Cir. 1984); *see also In re Violation of Rule 23(d)*, 635 F.3d 1352, 1356 (Fed. Cir. 2011) ("There is a strong presumption in favor of a common law right of public access to court proceedings."). The "universal interest in favor of open judicial proceedings" includes a "public interest in access to the identities of litigants." *Doe v. Megless*, 654 F.3d 404, 411 (3d Cir. 2011); *see also DePuy Synthes Prods., Inc. v. Veterinary Orthopedic Implants, Inc.*, 990 F.3d 1364, 1370 (Fed. Cir. 2021) (noting that "parties named in the litigation … must generally be disclosed to the public").

Transparency can also promote settlement and alternative dispute resolution. The judiciary long ago recognized this principle when it required disclosure of

similar information regarding insurance-funded litigation.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iv) (requiring parties to disclose "any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment"); *Cook v. Welty*, 253 F. Supp. 875, 877 (D.D.C 1966) (noting that "information concerning liability insurance coverage and its extent is conducive to fair negotiations and to just settlements").

Standing orders requiring disclosure of those with a financial or ownership interest in the case follow in a long tradition of transparency and are justified even apart from their importance in helping courts comply with their ethical obligations.

### C.    Transparency Is Especially Important In An Era Of Opaque Litigation Funding And Hedge-Fund Driven Litigation

Transparency is especially important now given the increasing frequency of NPE cases supported by third-party funders and hedge funds.  While the nominal party to these cases is a shell corporation with minimal activity, the litigation is driven by investors, such as hedge funds, operating behind the scenes.  *See* Langford, *Betting on the Client: Alternative Litigation Funding Is an Ethically Risky Proposition for Attorneys and Clients*, 49 U.S.F. L. Rev. 237, 239 (2015) (noting that, increasingly, "companies view financing litigation as an investment" and "investment funds are becoming involved in this practice" of funding litigation for

profit). These funders can dictate how the case is litigated, including decisions about whether to settle, and they stand to benefit financially from a favorable decision.

Scholars have commented on the lack of transparency inherent in this model. *See* Kalajdzic et al., *Justice for Profit: A Comparative Analysis of Australian, Canadian and U.S. Third Party Litigation Funding*, 61 Am. J. Comp. L. 93, 136 (2013) ("Given the relatively shrouded nature of the practice of [third party litigation funding] in the United States, lawyers are still grappling with the ethical challenges presented by these arrangements."). This system—in which there is "virtually no monitoring" of funding, *id*. at 137—makes the real reasons for a lawsuit invisible to the public eye, and often to the judge presiding over the case as well.

The lack of transparency has a range of "potential adverse consequences … including frivolous litigation and settlement disincentives." *See* Xiao, *Heuristics, Biases, and Consumer Litigation Funding at the Bargaining Table*, 68 Vand. L. Rev. 261, 274 (2015). Investment firms funding NPEs acquire huge bundles of patents with the intent to bring many lawsuits, betting that even if many turn out to be frivolous, they will still make a large profit overall. *See generally* Taylor, *Disclosing High Roller Bankrolling in the Patent Litigation Casino: The Need to Regulate Third Party Litigation Financing*, J. Pat. & Trademark Off. Soc'y (forthcoming). This practice has resulted in increased litigation that lacks merit, but still forces technology companies to expend vast sums of money to defend themselves. At the

same time, these cases tend to be more difficult to settle, because the shell companies are effectively immune from countersuits or ordinary commercial constraints. Innovator companies are therefore left with few options other than to litigate an endless stream of challenges regardless of their merit.

Moreover, NPE litigation driven by financial speculation continues to grow. *See* Miller et al., *Who's Suing Us? Decoding Patent Plaintiffs Since 2000 with the Stanford NPE Litigation Dataset*, 21 Stan. Tech. L. Rev. 235, 275 (2018). One industry report found that in 2021, patent assertion entities (a subset of NPEs) accounted for nearly half of all patent litigation in U.S. district courts. Unified Patents, *Litigation Annual Report, 2021* (last accessed Nov. 28, 2022), https://portal.unifiedpatents.com/litigation/annual-report. Litigation funders in the United States had $12.4 billion in assets under management in 2021, up from $11.3 billion in 2020. Merken, *Large Law Firms Tap Bigger Share of 'Portfolio' Litigation Funding*, Reuters (Mar. 23, 2022), https://tinyurl.com/4rny5v66.

Ultimately, secret third-party litigation funding hinders the development of new products and stifles innovation. Companies that actually create new and innovative products must spend enormous amounts of time and resources defending themselves against constant litigation from NPEs, which diverts attention away from creating and refining the products themselves. The benefits to hedge-fund investors, which often include high-net-worth individuals and foreign sovereign wealth funds,

come at the detriment of average consumers. It can even have national security implications. *See* U.S. Chamber of Commerce Institute for Legal Reform, *A New Threat: The National Security Risk of Third Party Litigation Funding* (Nov. 2022) (noting national-security risks created by lack of transparency in third-party litigation funding).

## CONCLUSION

The district court's standing orders are well within its authority and serve important purposes.

Respectfully submitted,

/s/ William F. Lee

| | |
|---|---|
| THOMAS G. SAUNDERS | WILLIAM F. LEE |
| GREGORY H. LANTIER | SOFIA C. BROOKS |
| AMANDA L. MAJOR | WILMER CUTLER PICKERING |
| JOSHUA L. STERN |    HALE AND DORR LLP |
| MATTHEW E. VIGEANT | 60 State Street |
| GARY M. FOX | Boston, MA  02109 |
| WILMER CUTLER PICKERING | (617) 526-6000 |
|    HALE AND DORR LLP | |
| 1875 Pennsylvania Avenue, NW | *Attorneys for Amicus Curiae Intel* |
| Washington, DC  20006 | *Corporation* |
| (202) 663-6000 | |

December 9, 2022

## CERTIFICATE OF SERVICE

I hereby certify that, on this 9th day of December, 2022, I filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Additionally, on this 9th day of December, 2022, I caused a copy of the foregoing to be served via overnight courier to the U.S. District Judge:

The Honorable Colm F. Connolly
J. Caleb Boggs Federal Building
844 N. King Street
Unit 31
Room 4124
Wilmington, DE  19801-3555

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1.      The filing has been prepared using a proportionally spaced typeface and includes 3,789 words.

2.      The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font.  As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ William F. Lee
WILLIAM F. LEE
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

December 9, 2022